**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1010-24

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JAMES A. FLOOD,

    Defendant-Appellant.

_____

Submitted May 27, 2026 – Decided July 24, 2026

Before Judges Susswein and Augostini.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 21-01-0032.

Jennifer N. Sellitti, Public Defender, attorney for appellant (James D. O'Kelly, Designated Counsel, on the brief).

Theodore N. Stephens II, Essex County Prosecutor, attorney for respondent (Shep A. Gerszberg, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant James Flood appeals the November 22, 2024 Law Division order denying his petition for post-conviction relief (PCR) without an evidentiary hearing. In December 2022, defendant pled guilty to aggravated manslaughter and related charges arising from a 2020 home invasion and fatal shooting. Defendant contends that his trial counsel rendered ineffective assistance by failing to file a Wade/Henderson[1] motion to challenge the admissibility of a witness's statement after the witness was shown video surveillance screenshots of the masked culprits. After considering the record in light of the governing legal principles, we affirm. We agree with the PCR court that defendant has not established the grounds for an evidentiary hearing, much less to vacate his guilty plea.

I.

We discern the following pertinent facts and procedural history from the record. On February 20, 2020, at approximately 1:54 p.m., police responded to a 9-1-1 call of a male who had been shot on the second floor of a Grove Street apartment building in Irvington. The victim, Daquan Smith, was pronounced dead at 2:28 p.m.

---

[1] United States v. Wade, 388 U.S. 218 (1967); State v. Henderson, 208 N.J. 208 (2011).

In the early hours of February 21, Quinton Sanguinette, who shared an apartment with the victim, provided a statement to detectives Mike DiPrimio and Dave Posada at the Essex County Prosecutor's Office (ECPO). Sanguinette stated that he fell asleep in the living room and was awakened at approximately 12:40 p.m. by a loud bang. When he awoke, he saw two men in the doorway and the victim lying on the floor with a gunshot wound. According to Sanguinette, one of the men, later identified as Lawrence Lewis (Lawrence[2]), was "large" and the other, later identified as defendant, was "smaller," a little shorter than Sanguinette, who is about 5'8". Sanguinette told the detectives the larger man was yelling, "Where it's at?" and the shorter man had a gun in his hand. Both intruders were wearing ski masks, and the shorter one was wearing all black, including black gloves and boots. While the ski masks obscured most of their faces, Sanguinette stated that the smaller man's skin tone was visible around his eyes. Sanguinette described the shorter man's skin as caramel colored. The two intruders eventually ran out of the apartment and down the stairs. Sanguinette attempted to give medical aid to Smith while another roommate called the police.

---

[2] Because Lawrence shares a surname with another witness, we refer to him and the witness by their first names.

3

Officers were able to secure video surveillance recordings taken outside the apartment building. Those recordings show a blue Acura TL stop around the corner from the building, and depict four individuals getting out of the car: Lawrence, defendant, and two women—later identified as Lakirah Lewis and Monique Clark. The video then shows Lakirah[3] get into the driver seat while Lawrence, Clark, and defendant walk toward the Grove Street apartment building. In the video, defendant is wearing black pants and a black shirt with the word "BLACK" printed in white letters across the front of the shirt. A few minutes later, the video shows Lawrence and defendant—their faces now covered by masks—running from Grove Street apartment building towards the waiting Acura. Defendant is seen wearing the same clothes as before. Both men get into the Acura, which then drives away.

During his interview with the detectives, Sanguinette was shown two still images extracted from the surveillance recording. The detectives asked Sanguinette whether he "recognize[d] any of these photographs" and whether he "recognize[d] anything" in each photo. In response to the first image, which depicted an individual wearing a hooded sweatshirt standing by a car, Sanguinette stated, "I don't know who that is," but identified the car as belonging

---

[3] See note 2.

to the victim. In response to the second image, which depicted a man wearing black pants, a black shirt with white writing, and a black mask, Sanguinette stated, "[T]hat looks like the dude who was holding the gun."

On February 21, 2020, Clark provided a statement in which she identified herself, Lakirah, and Lawrence in the surveillance recording and selected still images from the footage. However, she did not identify defendant, and on March 5, she failed to select defendant from a photo array. Also on February 21, Lakirah identified herself, Clark, and Lawrence in the surveillance recording.

On March 6, detectives interviewed Reena Williams, who is Lakirah's sister, Lawrence's aunt, and defendant's cousin. Williams told detectives that Clark, Lakirah, and Lawrence came to her house the night of the incident and that Lakirah told her that Lawrence and defendant came running back to the car saying someone was shooting at them. Williams identified Lakirah and Lawrence from police photos and stills from the surveillance video. She also identified Lawrence's blue Acura. She did not, however, identify defendant.

On March 9, police interviewed Muneerah Murphy—a cousin of Lakirah, Lawrence, and defendant. Murphy stated that defendant lived in Atlanta but was staying with her in New Jersey around the time of the homicide. Murphy told

detectives that she had not seen defendant since the month of the homicide and did not know where he went after leaving her residence. Murphy identified both defendant and Lawrence from police photos and surveillance video stills.

In January 2021, defendant was charged by indictment with conspiracy to commit robbery, N.J.S.A. 2C:5-2 and 2C:15-1(a)(1) (count one); first-degree robbery, N.J.S.A. 2C:15-1(a)(1) (count two); felony murder, N.J.S.A. 2C:11-3(a)(3) (count three); knowing/purposeful murder, N.J.S.A. 2C:11-3(a)(1)-(2) (count four); unlawful possession of a handgun, N.J.S.A. 2C:39-5(b) (count five); and possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count six).

On December 2, 2022, defendant pled guilty pursuant to a negotiated plea agreement to conspiracy to commit robbery, first-degree robbery, aggravated manslaughter (downgraded from the indicted murder charge), and unlawful possession of a handgun. As part of the plea agreement, the State agreed to recommend a prison term of twenty-two years subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, and to dismiss counts three and six of the indictment. On February 3, 2023, defendant was sentenced in accordance with the plea agreement.

A-1010-24

Defendant did not file a direct appeal.  He filed the present PCR petition in late December 2023.  On November 22, 2024, the PCR court held oral argument after which it denied defendant's petition without conducting an evidentiary hearing, issuing a thirty-three-page written decision.

This appeal followed.  Defendant raises the following contentions for our consideration:

> POINT I
> THE PCR COURT'S LEGAL AND FACTUAL CONCLUSIONS REGARDING SANGUINETTE'S STATEMENT WERE ERRONEOUS AND ITS CONCLUSION THAT TRIAL COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO FILE A <u>WADE</u> MOTION SHOULD BE REVERSED.
>
> > A. Issues With ECPO's Interview of Sanguinette and The PCR Court's Summary of Sanguinette's Interview.
> >
> > B. The PCR Court's Erroneous Factual Conclusions.
> >
> > C. The PCR Court's Erroneous Legal Conclusions.
> >
> > D. The PCR Court Faulted Defendant For Not Supplying Information That Was Outside of the Record.
> >
> > E. Defendant Has Established Both Prongs of the <u>Strickland</u>/<u>Fritz</u> Test.
>
> POINT II
> THE GENERAL POLICY CONCERNS RELIED UPON BY THE PCR COURT WERE MISPLACED,

7

LEGALLY IRRELEVANT AND COULD NOT PROPERLY SUPPORT THE DENIAL OF DEFENDANT'S PCR PETITION.

II.

We begin our analysis by acknowledging the legal principles governing PCR petitions, starting with the scope and standard of review. We review a PCR court's legal conclusions de novo. State v. Harris, 181 N.J. 391, 419 (2004). Appellate review "of a PCR court's factual findings is 'necessarily deferential.'" State v. Hernandez-Peralta, 261 N.J. 231, 246 (2025) (quoting State v. Nash, 212 N.J. 518, 540 (2013)), subject to an important caveat. When as in this case the PCR court does not hold an evidentiary hearing, we review both the factual inferences drawn from the record and any legal conclusions de novo. State v. Balbosa, 481 N.J. Super. 497, 519 (App. Div. 2025). See also Nash, 212 N.J. at 540-41; State v. Aburoumi, 464 N.J. Super. 326, 338 (App. Div. 2020). Furthermore, when applying de novo review, appellate courts "view the facts in the light most favorable to the defendant." State v. Jones, 219 N.J. 298, 311 (2014).

There is support in the case law for the proposition that appellate courts review a PCR court's decision on whether to proceed without an evidentiary hearing for an abuse of discretion. See Balbosa, 481 N.J. Super. at 519-20

(citing State v. Vanness, 474 N.J. Super. 609, 623 (App. Div. 2023)).[4] However, given uncertainty as to the appropriate standard of review of a trial court's decision on whether to hold an evidentiary hearing, we err on the side of caution and review de novo whether defendant in this case has established the grounds for an evidentiary hearing.

Turning to substantive legal principles, PCR serves the same function as a federal writ of habeas corpus. Preciose, 129 N.J. at 459. PCR provides "a built-in 'safeguard that ensures that a defendant was not unjustly convicted.'" Nash, 212 N.J. at 540 (quoting State v. McQuaid, 147 N.J. 464, 482 (1997)). When petitioning for PCR, a petitioner must establish, by a preponderance of

---

[4] Applying an abuse-of-discretion standard to a PCR court's decision to deny a PCR petitioner's request for an evidentiary hearing appears to be in tension with the long-settled rule that we review de novo not only a trial court's interpretation of the law but also the legal "consequences that flow from established facts." State v. Gamble, 218 N.J. 412, 425 (2014). Cf. Balbosa, 481 N.J. Super. at 519 (stating that "we review both the factual inferences drawn from the record and any legal conclusions de novo" and that "[w]e review the PCR court's decision to proceed without an evidentiary hearing for an abuse of discretion."). Arguably, the question of whether a defendant has established a prima facie case in support of PCR—a critical inquiry in determining whether an evidentiary hearing is required—is a question of law, or at least a mixed question, that is, a legal consequence that flows from established facts. See R. 3:22-10(b); see also State v. Preciose, 129 N.J. 451, 462 (1992) (PCR courts "ordinarily should grant evidentiary hearings . . . if a defendant has presented a prima facie [case] in support of post-conviction relief.").

A-1010-24

the credible evidence, that they are entitled to the requested relief.  Id. at 541. To meet this burden, the petitioner must allege and articulate specific facts, "which, if believed, would provide the court with an adequate basis on which to rest its decision."  State v. Mitchell, 126 N.J. 565, 579 (1992).

A defendant alleging ineffective assistance of counsel must satisfy both prongs of the two-part test set forth by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984), and adopted by the New Jersey Court in State v. Fritz, 105 N.J. 42 (1987).  "First, the defendant must show that counsel's performance was deficient."  Strickland, 466 U.S. at 687.  Second, the defendant must show that counsel's "deficient performance prejudiced the defense."  Ibid.

To meet the first prong of the Strickland/Fritz test, a defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Ibid.  Counsel's performance is held to a standard of "reasonableness under prevailing professional norms."  Id. at 688.  Stated another way, "the defendant must show that counsel's representation fell below an objective standard of reasonableness."  Ibid.; see also State v. Marshall, 148 N.J. 89, 156-57 (1997).

10

A-1010-24

Importantly for purposes of this appeal, when a PCR petitioner asserts that their attorney was ineffective by failing to file a specific motion, they must establish that the motion would have been successful. State v. O'Neal, 190 N.J. 601, 619 (2007). "It is not ineffective assistance of counsel for defense counsel not to file a meritless motion." Ibid.; see also State v. Worlock, 117 N.J. 596, 625 (1990) ("The failure to raise unsuccessful legal arguments does not constitute ineffective assistance of counsel.").[5]

The second Strickland prong requires that the petitioner show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. Counsel's errors must create a "reasonable probability" that the outcome of the proceedings would have been different if counsel had not made the errors. Id. at 694. Our Supreme Court emphasized in State v. Gideon that the second prong sets forth "an exacting standard." 244 N.J. 538, 551 (2021) (quoting State v. Allegro, 193 N.J. 352, 367 (2008)). "Prejudice is not to be presumed;" rather, "[t]he defendant must 'affirmatively prove prejudice.'" Ibid. (citing Fritz, 105 N.J. at 52, and

---

[5] We note that a PCR petitioner's failure to establish that a motion to suppress would have been successful is also relevant, if not dispositive, with respect to the second prong of the Strickland/Fritz test, since a defendant would be hard pressed to show prejudice from the failure to file a motion that would have been denied.

A-1010-24

quoting Strickland, 466 U.S. at 693). Further, to set aside a guilty plea based on ineffective assistance of counsel, a PCR petitioner must demonstrate "a reasonable probability that, but for counsel's errors, [the petitioner] would not have pled guilty and would have insisted on going to trial." State v. Nunez-Valdez, 200 N.J. 129, 139 (2009) (alteration in original) (quoting State v DiFrisco, 137 N.J. 434, 457 (1994)).

Short of establishing entitlement to a new trial or to vacate a guilty plea, a PCR petitioner may demonstrate that an evidentiary hearing is warranted to develop the factual record in connection with an ineffective assistance claim. Preciose, 129 N.J. at 462-63. As a general matter, a defendant's claim of ineffective assistance of counsel "is more likely to require an evidentiary hearing because the facts often lie outside the trial record and because the attorney's testimony may be required." Id. at 462. However, a PCR petitioner is not automatically entitled to an evidentiary hearing. State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999). Rule 3:22-10(b) provides in pertinent part:

> [a] defendant shall be entitled to an evidentiary hearing only upon the establishment of a prima facie case in support of [PCR], a determination by the court that there are material issues of disputed fact that cannot be resolved by reference to the existing record, and a determination that an evidentiary hearing is necessary to resolve the claims for relief.

A-1010-24

With respect to the first of these three requirements, "[a] prima facie case is established when a defendant demonstrates 'a reasonable likelihood that [their] claim, viewing the facts alleged in the light most favorable to the defendant, will ultimately succeed on the merits.'" State v. Porter, 216 N.J. 343, 355 (2013) (quoting R. 3:22-10(b)).

## III.

We next apply these foundational PCR principles to the present facts. We cut to the chase by addressing whether defendant would have prevailed in a Wade/Henderson hearing had his trial counsel moved to suppress Sanguinette's statement to the detectives. See O'Neal, 190 N.J. at 619. That leads us to consider the law regarding out-of-court identification procedures.

## A.

Chief Justice Rabner's unanimous opinion in Henderson is the seminal eyewitness identification case in New Jersey. Drawing on social science studies compiled by a Court-appointed Special Master, the Court examined the vulnerabilities of human perception and memory, focusing on the circumstances that can lead to misidentification. Henderson, 208 N.J. at 217-18. The Court addressed various "estimator" variables (e.g., lighting conditions, distance, the length of time the witness has to observe the perpetrator, stress during an

encounter, and cross-racial effects) and "system" variables (i.e., the manner in which police administer a photo array procedure) that can influence a witness's ability to accurately identify a culprit. Id. at 247, 289-91.

With respect to system variables, the Court outlined best practices for police when administering eyewitness identifications, noting that "[t]he way that a live or photo lineup is constructed can . . . affect the reliability of an identification" and "[p]roperly constructed lineups test a witness'[s] memory and decrease the chance that a witness is simply guessing." Id. at 251. The Court also outlined standards for showing a photo array to a witness, recommending, for example, that police use a "double-blind" method to minimize the possibility that the officer administering the array might unconsciously send cues to the witness on which photo in an array depicts the suspected perpetrator. Id. at 248.

Importantly, the Court noted that deviations from the preferred procedures do not categorically require suppression of the witness's statement and any ensuing in-trial identification. Id. at 303. Rather, depending on the circumstances, a tailored jury instruction may be sufficient to ensure the jury does not overstate the significance of a positive eyewitness identification of the defendant. See id. at 296-99 (describing how "enhanced instructions" can suffice to avoid juror misconceptions).

14

The Court also adopted a four-step analytical framework for deciding whether to hold an evidentiary hearing and, if a hearing is warranted, whether to admit or suppress an out-of-court identification at trial. "First, to obtain a pretrial hearing," the Court held, "a defendant has the initial burden of showing some evidence of suggestiveness that could lead to a mistaken identification." Id. at 288. Only if a defendant makes that threshold showing does the trial court proceed to the second step, in which "[t]he State must then offer proof to show that the proffered eyewitness identification is reliable[,] accounting for system and estimator variables." Id. at 289. However, at any time, the court may end the hearing and conclude that the State has shown that defendant's initial showing of suggestiveness is groundless. Ibid.

Under the third step, the defendant bears the ultimate burden at the hearing "to prove a very substantial likelihood of irreparable misidentification." Ibid. "Fourth, if after weighing the evidence presented a court finds from the totality of the circumstances that defendant has demonstrated a very substantial likelihood of irreparable misidentification, the court should suppress the identification evidence." Ibid. The court nonetheless has the discretion to admit the identification evidence with appropriate, tailored jury instructions. Ibid.

B.

15

In applying these general principles to the matter before us, it bears emphasis that the circumstances of the present "identification" procedure—in which Sanguinette "identified" the masked perpetrator by clothing, build, and skin tone—are unusual and outside the heartland of the concerns addressed in Henderson. The Henderson analytical framework contemplates that the eyewitness is being asked to identify a specific person by considering, principally, the person's facial features. Much of the social science evidence on which the Henderson Court relies addresses challenges to a witness's ability to perceive and recall those features, see id. at 245-77, and Henderson did not explicitly address the identification of masked perpetrators in the context of its assessment of system variables.

The State argues, and the PCR court agreed, that Sanguinette's testimony was more akin to identification of physical evidence, which generally does not require a pretrial evidentiary hearing. It is well established in this regard that the "due process concerns implicated in the pretrial identification of a person are not present in the identification of physical evidence." State v. Jones, 224 N.J. 70, 93 (2016) (quoting State v. Delgado, 188 N.J. 48, 67 (2006)). This is because "[t]he risks inherent in a misidentification of inanimate objects produced in the thousands are not the same as the risks of misidentification of

16

unique human beings." <u>Delgado</u>, 188 N.J. at 67 (quoting <u>People v. Miller</u>, 535 N.W.2d 518, 523 (Mich. Ct. App. 1995)). The Court in <u>Delgado</u> accordingly declined to "mandate lineups and photographic arrays for cars and other objects." <u>Id.</u> at 66.

We are not fully persuaded by the State's argument that Sanguinette was essentially identifying physical evidence rather than a person. It can hardly be disputed that police showed Sanguinette an image of a person, whom he identified as one of the individuals he saw in his apartment. But it is also evident that the present identification procedure falls outside the heartland of <u>Henderson</u>'s analytical framework, as Sanguinette did not identify defendant directly—i.e., from a known photo of defendant included in an array—but rather stated that the masked person in the surveillance still was one of the intruders based on his clothing, build, and skin coloration. Stated another way, Sanguinette did not identify defendant, but rather the perpetrator's clothing, height/build, and skin coloration. The fact that the home intruders in this case were wearing masks is most logically treated as an <u>estimator</u> variable that may have affected Sanguinette's ability to identify them.

Ultimately, we consider the present identification procedure to be a hybrid, somewhere between the identification of a person and of purely physical

evidence. That said, we elect to err on the side of caution and give defendant the benefit of the <u>Henderson</u> framework for assessing whether an evidentiary hearing was required and, ultimately, whether the out-of-court statement Sanguinette made to police would have been inadmissible at trial.[6]

---

[6] Both parties in the matter before us rely on <u>Jones</u> to support their respective positions on whether and to what extent the <u>Henderson</u> analytical framework applies. However, we conclude that <u>Jones</u> is too factually distinct to provide much guidance here. In <u>Jones</u>, the police used a "showup" identification procedure rather than a photo lineup. 224 N.J. at 96. The police found a blue-and-white plaid jacket near the crime scene and suspected that the defendant had been wearing it at the time of the offense. <u>Id.</u> at 77. During the showup procedure, the witness first observed the defendant not wearing the jacket and did not recognize him as the perpetrator. <u>Id.</u> at 78. Police then placed the jacket on the suspect, and when the witness saw defendant wearing the jacket, she "realized it was him." <u>Ibid.</u>

The Court held the witness's identification of the suspect was governed by constitutional identification principles, not the principles governing identification of an inanimate object, because "[p]lacing a jacket on a person after his arrest and using that item of clothing during the eyewitness identification procedure when a witness is having difficulty identifying the suspect raises due process concerns." <u>Id.</u> at 96. The Court explained that "identifying an article of clothing that has been placed on a suspect during a showup" is fundamentally different from "merely show[ing] [the victim] the [clothing] they found in the vicinity near where defendant was located." <u>Id.</u> at 93. The Court concluded that the police orchestrated an impermissibly suggestive showup identification procedure. <u>Id.</u> at 96.

We are unpersuaded that <u>Jones</u> provides much guidance to help us resolve the matter before us. As we explain more fully in Section III.C, the present case raises none of the suggestibility concerns extant in <u>Jones</u>. The detectives simply presented Sanguinette with still images from a surveillance video recording.

18

C.

In analyzing whether a hypothetical <u>Henderson</u> motion would have succeeded, we begin by reiterating that "to obtain a pretrial hearing, a defendant has the initial burden of showing some evidence of suggestiveness that could lead to a mistaken identification." <u>Henderson</u>, 208 N.J. at 288. That evidence must be tied to a system variable—that is, a variable "within the State's control." <u>Id.</u> at 288-89, 248. We are satisfied that defendant has not established that Sanguinette's statement was tainted by impermissible suggestiveness as to render his "identification" unreliable.

Defendant first argues that the detectives improperly showed Sanguinette a single photo,[7] rather than an array. The Court in <u>Henderson</u> recognized that "mistaken identifications are more likely to occur when the suspect stands out from other members of a live or photo lineup." <u>Id.</u> at 251 (internal quotation marks and citation omitted). The Court explained, "Properly constructed [photo] lineups test a witness'[s] memory and decrease the chance that a witness is simply guessing." <u>Id.</u> at 251. The Court concluded that a photo array should contain at least five innocent fillers, and that the lineup should be "comprised of look-alikes." <u>Ibid.</u> But those requirements do not apply when, as in this case,

---

[7] We note that defendant was actually shown two images.

the witness is asked only to identify clothing, build, and skin-tone. Indeed, it begs incredulity to suggest that in these circumstances, police were required to compile an array of masked men.

In this instance, moreover, the detective's question—"tell me whether or not you recognize anything in this photo"—was neutrally phrased and did not invite any particular response. In sum, we are unpersuaded that the absence of a traditional array constituted sufficient evidence of suggestiveness so as to require a <u>Wade</u>/<u>Henderson</u> hearing.

Nor are we persuaded by defendant's contention that the detectives improperly "coached" Sanguinette into describing defendant's skin tone as "caramel," thereby creating an "unreliable identification." Our review of the transcript confirms that the detectives did not improperly coach Sanguinette, but rather asked neutral clarifying questions:

> [Detective Di Primio:] Okay. So what's—and what's he wearing?
>
> [Sanguinette:] All black with a ski mask over his face.
>
> [Detective Di Primio:] Okay. Now when you say a ski mask is there—can you see any skin? . . .
>
> [Sanguinette:] Yeah. I see just a little bit of the eyes right here. Part of it. He's like—he's darker than me, but not too dark. . . .

A-1010-24

[Detective Di Primio:]  Brownish, caramel color?

[Sanguinette:]  Yeah.  I don't really see too many brown.  It was like caramel.

Defendant argues that Sanguinette was "struggling" to describe defendant's skin tone and that Detective Di Primio provided a suggestion "unprompted."  We do not subscribe to defendant's interpretation of the conversation.  Rather, Sanguinette started to describe his own perception of the skin tone, Di Primio asked a neutral clarifying question to help Sanguinette be more precise, and Sanguinette responded based on his own memory—notably rejecting Di Primio's first adjective ("brownish") in favor of "caramel."

Defendant also contends that Sanguinette's identification of the person in the image was based on Di Primio's suggestive question earlier in the interview about the suspect's shirt.  After Sanguinette described the suspect's skin color, Di Primio asked, "Was there anything—any writing on his shirt? Was there anything distinct?"  Sanguinette's reply was indiscernible.

Defendant argues that Di Primo asked this question knowing that he would soon show Sanguinette an image of a person with visible writing on his shirt, thereby setting the plate for Sanguinette to identify the person in the image as the suspect.  We conclude Di Primio's question was neutral, open ended, and did not suggest any particular answer.  It is common for a shirt to feature writing or

21

other distinct graphics, and Di Primio was permitted to ask this basic, initial question.

In sum, even accepting if only for the sake of argument that the Henderson analytical framework applies in these circumstances, a timely motion for a Wade/Henderson hearing would have failed because defendant cannot show impermissible suggestiveness by the police.

IV.

Aside from failing to establish the first prong of the Strickland/Fritz test, defendant also fails under the second prong. Defendant has not established a reasonable probability that if he had somehow prevailed in suppressing Sanguinette's statement, he would have declined the plea offer tendered to him and proceeded to trial. See Nunez-Valdez, 200 N.J. at 139. As the PCR court aptly noted, the State had substantial additional evidence of defendant's guilt, including the surveillance footage and statements by defendant's cousins Williams and Murphy implicating him in the crime. Furthermore, defendant's plea offer was favorable, allowing him to avoid the thirty-years-to-life mandatory sentence he was facing on the murder charge that was downgraded pursuant to the plea agreement.

To the extent we have not specifically addressed them, any remaining arguments raised by defendant lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division